Filed 6/16/22  K.Y. v. Superior Court CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| K.Y.,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF FRESNO COUNTY,<br><br>    Respondent;<br><br>FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Real Party in Interest. | F084108<br><br>(Super. Ct. No. 21CEJ300060-1)<br><br><br>**OPINION** |

**THE COURT**[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Todd Eilers, Commissioner.

Moran Law Firm and Janay D. Kinder for Petitioner.

No appearance for Respondent.

Daniel C. Cederborg, County Counsel, and Carlie M. Flaugher, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]    Before Poochigian, Acting P. J., Smith, J. and Meehan, J.

K.Y. (mother) seeks an extraordinary writ from the juvenile court's orders issued at a contested six-month review hearing (Welf. & Inst. Code, § 366.21, subd. (e)(1))[1] terminating her reunification services and setting a section 366.26 hearing on July 14, 2022, as to her now 18-month-old son, B.Y. She contends the juvenile court erred in finding she was provided reasonable mental health services and in not finding there was a substantial probability B.Y. could be returned to her custody with continued reunification efforts. We deny the petition.

## I.     PROCEDURAL AND FACTUAL SUMMARY

*A.    Detention and Removal*

Two-month-old B.Y. came to the attention of the Fresno County Department of Social Services (department) in February 2021 after he was admitted to the hospital for failure to thrive because of insufficient feeding. The hospital staff attributed the baby's low weight to mother who was inattentive to his needs. The staff encouraged her to participate in caring for the baby but she let him lie in the crib excessively and had to be prompted to feed and change him. She told the nurses it was their job, not hers, to feed the baby. The nurses also had difficulty getting mother to wake up while in the hospital and noticed that she talked to herself. They suspected she had postpartum depression. Mother also suspected she had postpartum depression and was seeing a therapist.

The department offered mother voluntary family maintenance services but she declined. Consequently, the department took the baby into protective custody and placed him in foster care. The baby's alleged father lived in Australia. He and mother agreed he would not be involved in the baby's life.

The juvenile court ordered the baby detained pursuant to a dependency petition, alleging mother failed to feed him consistently, causing him to lose weight, and refused

---

[1]    Statutory references are to the Welfare and Institutions Code.

to follow the instructions of the medical staff. (§ 300, subd. (b)(1).) The court ordered the department to arrange weekly supervised visits and to offer mother parenting classes and a mental health evaluation and any recommended treatment.

The juvenile court sustained the petition at the jurisdictional hearing on March 18, 2021, and set the dispositional hearing for May 27, 2021.

Meanwhile, mother completed a mental health assessment. She presented with depressed mood, sadness, headaches, dizziness, " 'racing' " and obsessive thoughts, worry, restlessness, and hallucinatory symptoms. She was taking psychotropic medication prescribed by her primary care physician. The therapist who completed the assessment recommended mother participate in individual therapy and complete a psychological evaluation to clarify a diagnosis.

The baby meanwhile struggled to obtain nutrition. He refused his bottle and spit up. In May 2021, he was diagnosed with a tied lip and tongue, gastroesophageal reflux disease, a heart murmur and ultimately, a milk allergy.

On May 26, 2021, mother filed a modification petition under section 388 (section 388 petition), alleging the baby's failure to thrive was the result of lip ties on his upper and lower lips. A frenectomy to surgically correct the defect was necessary. Mother asked the juvenile court to return the baby immediately to her custody and demanded an apology from the department and the pediatric staff at the hospital.

The juvenile court ordered the baby removed from mother's custody at the dispositional hearing on May 27, 2021, ordered mother to complete the services previously offered as well as a psychological evaluation/risk assessment and set the six-month review hearing for November 18, 2021. The court did not order reunification services for the alleged father.

Mother appealed the juvenile court's jurisdictional finding and removal order and the appeal was dismissed. (*In re Phoenix H*. (2009) 47 Cal.4th 835, 844.)[2]

On May 28, 2021, mother filed a second section 388 petition, identical to the one filed on May 26, 2021. The juvenile court summarily denied it, finding it did not state new evidence or a change of circumstances. On June 1, the court summarily denied mother's section 388 petition filed on May 26, on the same grounds.

B.    *Initial Six Months of Reunification Efforts*

1.    Mother's Psychological Evaluation/Risk Assessment

On June 29, 2021, mother completed a psychological evaluation/risk assessment. The department summarized the findings and observations in its six-month review report. Mother was diagnosed with unspecified schizophrenia spectrum and other psychotic disorder and (provisional) persistent depressive disorder with anxious distress. There was no evidence of mental retardation, a brain disorder or a diagnosed condition or disability that impaired her parenting. It was likely mother was capable of utilizing family reunification services given her compliance with her court-ordered services. Her score on the "Parenting Stress Index/Competence" subscale indicated she appeared to be overwhelmed by the demands of being a parent and lacked a sense of competence as to how to manage her son. The examiner believed mother would likely benefit from parenting skills training. The department noted, however, that she received parenting skills training at Intensive Services Visitation and the Pediatric Specialty Feeding Clinic but was unsuccessful. She was unable to remember the skills necessary to care for the baby and required constant reminders. In regard to overall functioning, it was recommended she " 'continue to seek mental health support in the form of psychotherapy to address her symptoms of depression and anxiety, as well as to monitor and continue to

---

[2]    *In re B.Y.* (Mar. 3, 2022, F083109) [nonpub. opn.]).

4

gather information on her odd behavior.' " In regard to the level of risk the baby would experience if returned to mother's custody, the report indicated the risk would be moderate. In regard to visitation, it was recommended mother continue to participate in supervised visitation.

During the evaluation/assessment, mother tapped her feet rapidly, "glancing at the wall behind the examiner several times as though looking at something." She randomly made gestures, shaking her head to indicate no, and signaled with her hand to stop or wait. Throughout the interview, mother "put her head down, covered her eyes with her hands while speaking with the examiner, and scratched herself leaving scratch marks." She also whispered to herself. Under the section, "Child Abuse Potential Inventory," the examiner stated mother's abuse scale indicated an increased risk of physical abuse.

2.     Mother's Section 388 Petitions

On July 2, 2021, B.Y. underwent a frenectomy to correct his lips and tongue tie. On July 19, he was referred for pediatric surgery for placement of a gastrostomy tube. The decision was subsequently made to insert a gastrostomy-jejunostomy tube (GJ tube).

On July 13, 2021, mother filed a section 388 petition asking the juvenile court to vacate its jurisdictional findings and dispositional orders and return the baby to her custody because new evidence provided a medical explanation for why the baby was not gaining weight; he had a "tongue and lip tie," which required a maxillary buccal frenectomy and a mandibular lingual frenectomy. Returning the baby to mother's custody was in his best interest because his failure to thrive was not because of her negligence. He failed to thrive even after he was removed from her because of his medical condition. The court set an evidentiary hearing for July 29, 2021.

The department recommended against placing the baby with mother. Although he was consuming more, he had not gained the desired weight and mother continued to need prompting and guidance to care for him. On June 4, during the baby's occupational

therapy session, mother was on her phone talking to herself and randomly giggling. She covered herself with a blanket, hiding her face, and did not participate in the session. She was unable to read the baby's cues and her anxiety increased when he was fussy or crying.

The juvenile court denied the section 388 petition mother filed on July 13, 2021. It found mother's circumstances were "changing" in that a medical cause of the baby's failure to thrive had been discovered and repaired and he was improving and starting to thrive. However, the court was concerned that mother may not be able to handle the medical complexities associated with the baby's medical conditions, explaining its concerns arose "out of behaviors on her part that have been documented and her own behaviors I've seen exhibited when she's appeared before me, going back to detention …."

Mother appealed the juvenile court's order denying her section 388 petition and the appeal was dismissed. (*In re Phoenix H*., *supra*, 47 Cal.4th at p. 844.)[3]

On October 15, 2021, mother filed a section 388 petition and another one on November 2, 2021. In the October 15 petition, she asked the juvenile court to return the baby to her custody because the psychological evaluation was complete and did not reveal any abnormality. In the section 388 petition filed on November 2, she asked the court to require social worker Po Yang to appear at all of her visits and medical appointments since she accused mother of failing to meet the baby's needs. By attending, Yang could observe how mother cared for the baby.

---

[3]    *In re B.Y.* (Mar. 3, 2022, F083166) [nonpub. opn.]). On our own motion, we take judicial notice of our case file and opinion in case No. F083166. (Evid. Code, §§ 452, subd. (d), 459, subds. (a)–(c).)

6

### 3. The Department Recommended Termination of Reunification Services

In its report for the six-month review hearing, the department recommended the juvenile court terminate mother's reunification services and deny the section 388 petition she filed in October 2021.[4]  Although mother regularly visited the baby and completed a parenting program, her progress was minimal and she appeared incapable of meeting the baby's specialized care needs.  She began supervised intensive services visitation in March 2021 because of her concerning behavior.  She visited twice weekly and received coaching and mentoring.  However, she required continuous guidance and direction on how to take care of the baby and immediately returned him to the foster parent if he became fussy.  The baby had a GJ tube and required routine venting because he was unable to release air that entered his intestines.  Mother was not trained in how to use the GJ tube because she caused the baby distress which affected his ability to obtain nutrition.  She was unable to read the baby's cues and remember techniques to comfort him from one visit to the next.  Several times the visit had to be terminated early because the baby was crying and unable to calm down.  By November 2021, mother was required to wait in the lobby during the baby's therapy sessions because her behavior dysregulated him.  Even though she wanted to learn how to feed the baby, he screamed and cried when she held him.  After the sessions were over, mother received instruction on how to feed him.

In addition, there were continuing concerns about mother's mental health.  Her thinking was disorganized and her speech and movements were repetitive.  As an example, the baby had oral aversion and the medical staff were trying to teach mother how to stimulate him to eat by moving a carrot inside his mouth.  Mother became fixated on the idea that he might be able to eat a carrot.  In addition, she did not make eye contact

---

[4]    In an apparent typographical error, the department identified the section 388 petition as having been filed on October 19, 2021, instead of October 15, 2021.

with the staff, often covering her face with a blanket and rocking back and forth, and talked and giggled on her phone when there was no one on the line. In early November 2021, Yang saw mother speaking intensely with someone who was not there. She was informing the person and answering questions. She sat down and then stood up and continued speaking while making hand gestures as if she were speaking to someone in front of her. She started crying and then sat down and put her face in her hands. After several seconds, she turned to her right and repeated " 'I don't know' " several times before turning back and continuing her conversation.

On November 18, 2021, the juvenile court denied the section 388 petition mother filed on November 2, 2021, and set a contested six-month review hearing to be conducted on March 17, 2022, in conjunction with a hearing on the section 388 petition mother filed on October 15, 2021.

C.     *Reunification Efforts Pending the Contested Six-Month Review Hearing*

Following the November 18 hearing, mother accelerated her efforts to reunify by requesting additional services. She requested a referral to "Exceptional Parents Unlimited" (EPU) for the in-home parenting program. Yang explained the program was appropriate for situations where the child was in the home but referred mother to the "Nurturing Parenting Program," which was scheduled to begin in January 2022. In February 2022, mother enrolled in a third parenting program through EPU. Mother also asked to complete a behavioral analysis and was told her clinician would have to recommend it. She requested a referral for domestic violence, explaining she had abusive relationships with men. After Yang told her it would require a court order, mother self-enrolled in the "SAFE Group Program" through the Marjaree Mason Center and provided the department a letter stating she was receiving supportive services consisting of classes, groups, counseling, and safe housing.

Mother also procured services on her own. In December 2021, she completed a psychological evaluation and, according to the report, was diagnosed with schizoaffective disorder (depressive type, unspecified) and posttraumatic stress disorder. The psychologist reported mother had a history of childhood trauma and an "enduring presence of mood instability and psychosis." Throughout the assessment, she appeared "distractable and paranoid" and frequently discussed her difficulty managing her environment because of her mental health difficulties. The psychologist recommended she participate in outpatient mental health treatment to address mood management, thought distortions and trauma. In February and March 2022, mother completed a second psychological evaluation. The psychologist noted mother had some mental health struggles that did not appear to have been evaluated in the context of parenting capability. She recommended mother continue to participate in mental health therapy to manage her stressors and to learn better parenting skills. The psychologist believed it would be beneficial to thoroughly assess mother's relationship with the baby to better understand the dynamics of her parenting. Mother informed Yang that the psychologist wanted to observe her with the baby. Yang advised mother a court order would be required and told her to contact her attorney.

Mother also informed Yang that she continued to participate in mental health treatment and was taking psychotropic medication. She provided a letter from psychiatrist Dr. Saoda Shuara dated January 27, 2022, stating she was being treated for major depressive disorder, unspecified schizophrenia spectrum and other psychotic disorder and was on medication.

In an addendum report filed on March 17, 2022, the department maintained its recommendation that the juvenile court terminate mother's reunification services. Mother began to show improvement in January 2022 in her ability to engage the baby. She read to him and walked with him around the room while holding his hands. She

9

attempted to keep up with him as his attention shifted from one interest to another. She spoke to herself but not in a manner that would be perceived as odd. However, she had not made sufficient improvement to warrant advancing to less restrictive visitation. In addition, the baby was doing well in his placement and the foster parents were interested in adopting him. Mother supported adoption by the foster parents if she was unable to reunify.

D.      *March 17, 2022, Contested Six-Month Review Hearing*

Yang testified mother completed her court-ordered services. Yang did not speak to mother's therapist or review any reports as to her progress in therapy. The quality of mother's visits improved because she was beginning to show improvement in her ability to engage with the baby. However, she was still unable to detect when the baby was hungry or agitated. She did perceive he was upset if he was crying. When mother asked for a behavioral analysis, Yang told her the department would meet with her therapist and make a recommendation that it was needed. The department never received a recommendation. Yang could not say whether mother would benefit from an additional six months of services.

Mother testified she received mental health treatment during her pregnancy with the baby. She continued to participate in mental health therapy and saw a psychiatrist every six weeks. She began the 14-session "SAFE" program at the Marjaree Mason Center on March 1, 2022, and participated in weekly one-hour sessions. She believed she was benefitting from her services. She was able to observe the baby's feedings at the doctor's appointments.

Mother's sister testified she was able to observe mother with the baby as a newborn. Mother was calm and quick to ask for help. Twice mother saved the baby from choking on his formula while the sister was feeding him. After the baby was removed, mother isolated herself. However, the sister noticed her change in the last year.

She attended to the baby and interacted with him and was engaged with the social workers and in the court proceedings. She also noticed mother's mental health improved in that she was more organized.

County counsel argued that although mother made some progress, it was insufficient to find that the baby could be returned to her within the 12-month statutory limitation on services which the parties and the court agreed would occur on March 25, 2022. The court asked county counsel how her argument would change if the court considered the hearing to be a combined six- and 12-month review hearing. County counsel stated its position would not change. Minor's counsel joined in county counsel's argument.

Mother's attorney argued she made major improvements in her life and sought out additional help to address the department's concerns. She argued the standard was a six-month review and mother had potential to reunify if her services were continued.

The juvenile court found it would be detrimental to return the baby to mother's custody and denied her section 388 petition filed on October 15, 2021. The court found by clear and convincing evidence mother was provided reasonable reunification services and participated in her services plan but did not make substantive progress. The court also found there was not a substantial probability the baby could or would be returned to mother's custody whether applying the six- or 12-month review statute. The court terminated mother's reunification services and set a section 366.26 hearing.

## II. DISCUSSION

Mother raises two issues in this case; the first is whether the department provided her reasonable mental health services. We conclude substantial evidence supports the juvenile court's finding that it did. Second, mother contends the juvenile court misapplied section 366.21, subdivision (e)(1) which governs the six-month review hearing because it did not realize it could continue reunification services beyond the

11

12-month review hearing. Although mother cites abuse of discretion as the applicable standard, we review issues involving the proper application of the dependency statutes de novo. (*In re M.F.* (2022) 74 Cal.App.5th 86, 100 (*M.F.*)

A.      *Applicable Law*

1.      Family Reunification Services

The paramount goal in the initial phase of dependency proceedings is family reunification. (*In re Precious J.* (1996) 42 Cal.App.4th 1463, 1472 [" 'Family preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced. [Citation.]' "].)

The purpose of reunification services is to place the parent in a position to gain custody of the child. (*In re Karla C.* (2010) 186 Cal.App.4th 1236, 1244.) "The foundation and central, unifying tool in child welfare service is the [reunification] plan. The [reunification] plan must provide for the child's care and case management and must provide services that facilitate both return and, concurrently, permanency." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2020 ed.) Disposition Hearing, § 2.129[4].) To that end, the department must devise a reunification plan tailored to the unique needs of the family and make a good faith effort to help the parent access the services the plan provides. (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)

"The adequacy of reunification plans and the reasonableness of the [department's] efforts are judged according to the circumstances of each case." (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.) "To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult ....' [Citation.] 'The standard is not whether the services provided were the best

12

that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426.)

2.     Statutory Timelines

When the juvenile court removes a child from parental custody and adjudges the child a dependent, the court must ordinarily order family reunification services for the parent and child.  (§ 361.5, subd. (a).)  For a child under the age of three when first removed, reunification services are presumptively limited to six months.  (§ 361.5, subd. (a)(1)(B).)  The statute provides that for a child in that age class, the juvenile court shall provide reunification services "for a period of 6 months from the dispositional hearing as provided in subdivision (e) of Section 366.21, but no longer that 12 months from the date the child entered foster care, as provided in Section 361.49 .…"  (§ 361.5, subd. (a)(1)(B).)

A child is deemed to have entered foster care on the earlier of the date of the jurisdictional hearing or 60 days after the date on which the child was initially removed from parental custody.  (§ 361.49.)  Furthermore, the juvenile court must conduct a six-month status review hearing "6 months after the initial dispositional hearing, but no later than 12 months after the date the child entered foster care as determined in Section 361.49, whichever occurs earlier .…"  (§ 366.21, subd. (e)(1).)  The same 12-month date generally governs the 12-month review hearing, which under the statute "shall be held no later than 12 months after the date the child entered foster care .…" (§ 366.21, subd. (f).)

Notwithstanding the 12-month presumptive limitation on reunification services, the juvenile court has the authority to extend services up to a period of 18 months after the child's initial removal from parental custody if it is shown at the 12-month review hearing " 'that the permanent plan for the child is that the child will be returned and

13

safely maintained in the home within the extended time period.' " (*M.F.*, *supra*, 74 Cal.App.5th at pp. 101–102.)

"Eighteen months is therefore generally considered the outer statutory time limit for reunification services. [Citations.] Indeed, the statutory scheme requires the permanency review hearing (when services have been extended beyond the 12-month review hearing) to occur 'within 18 months after the date the child was originally removed from the physical custody' of the parent. [Citation.] In other words, if the court does not return the child at the 12-month review hearing and finds there is no substantial probability of return to the parent within 18 months of the initial removal from parental custody, 'the court must terminate reunification efforts and set the matter for a hearing pursuant to section 366.26 for the selection and implementation of a permanent plan. [Citation.]' " (*M.F.*, *supra*, 74 Cal.App.5th at p. 102.)

The review hearing statutes presume that the hearings are conducted in a timely manner. When they are not, "reunification services and timing of review hearings are to be determined relative to the child's initial removal into custody or the jurisdictional or dispositional hearing, not the length of previous services or the dates of previous review hearings." (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 846 (*Tonya M.*).) Consequently, the juvenile court is required to reevaluate the propriety of future services under the new applicable standard for that hearing and lacks the authority to order services extending beyond the next review hearing. (*Id.* at p. 845.)

B.     *Application*

1.     Mother Was Provided Reasonable Reunification Services

Mother contends the department provided her a "standard" reunification plan rather than one tailored to her mental health needs and then failed to execute it by discussing her treatment with her therapist and obtaining progress reports. We disagree.

As a preliminary matter, it bears noting that the full extent of mother's mental state was not known at the beginning stages of the dependency case. It was apparent that she had some sort of mental health problem, possibly depression. However, the department did not have any specific medical information. Consequently, it appropriately recommended a mental health assessment to determine what additional treatment, if any, was indicated. A mental health assessment and any recommended treatment was ordered as part of her reunification plan at the dispositional hearing. Mother did not challenge the adequacy of mental health services in her appeal from the dispositional orders. Nor did she raise it at any time by filing a section 388 petition, seeking modified mental health services. Consequently, she forfeited the issue of the reasonableness of the plan content, including the mental health services ordered. (*In re Julie M*. (1999) 69 Cal.App.4th 41, 47.)

By the hearing in March 2022, mother had completed a mental health assessment and was referred for individual therapy and a psychological evaluation/risk assessment. The psychologist established several psychiatric diagnoses for her and determined she could benefit from reunification services. The psychologist recommended she participate in psychotherapy to address her depression and anxiety, and parenting skills training. Mother was participating in these services and receiving psychotropic medication under the supervision of a psychiatrist through the department. She failed to show that those services did not meet her mental health needs or that there were additional or different services that the department was aware would assist her in treating her mental illness but did not offer her. Nor did she show that the department's failure to consult with her therapist or obtain progress reports deprived her of reasonable reunification services. We thus conclude substantial evidence supports the juvenile court's finding mother was provided reasonable reunification services.

15

2. <u>The Juvenile Court Properly Applied the Law in Terminating Mother's Reunification Services</u>

The juvenile court set the date of foster care entry, under section 361.49, as March 25, 2021. As a result of continuances, the court held the six-month review hearing on March 17, 2022, essentially one week before a 12-month review hearing would have been conducted.[5] Because the juvenile court lacked the authority to order services extending beyond the next review hearing unless it found there was a substantial probability the baby could be returned to mother's custody within a week, which was not feasible, the court was technically prohibited from extending services.

While this result may seem untenable, the Supreme Court reinforced the statutory time limits for review hearings despite delays that threatened to encroach on a parent's reunification timeline. In *Tonya M.*, the court considered whether at a six-month review hearing the juvenile court should "consider the likelihood of reunification during the next six months after the hearing, or the likelihood of reunification in such time as remains until a potential 12-month review hearing, even if less than six months[.]" (*Tonya M.*, *supra*, 42 Cal.4th at p. 840.) The Court assessed the specific statutory language and broader statutory context and concluded that "[d]elays in the timing of one hearing should not affect either the timing of subsequent hearings or the length of services to be ordered." (*Id*. at p. 846.) Where delays in the completion of a prior review hearing

---

[5]    We calculate the date of foster care entry as March 18, 2021. The baby was taken into protective custody on February 11, 2021. Sixty days from that date was April 12, 2021. However, the jurisdictional hearing was conducted on March 18, 2021, making it the earlier date. Twelve months from March 18, 2021, was March 18, 2022. Consequently, the statutory limitation on reunification services fell on the day following the six-month review hearing. However, whether a day or a week remained before the 12-month statutory limitation makes no difference in this case. As we discuss, by not combining the six-month with a 12-month review hearing, the court potentially foreclosed the ability to consider a continuation of reunification efforts.

would leave only four months of reunification time before the next review date, as prescribed by section 366.21, the court held the juvenile court "should consider only what the impact of *those* four months of services would be on the parent and child, not whether another hypothetical two months of services beyond the next prospective hearing might have a different or additional impact." (*Tonya M.* at p. 846.)

The Court explained,

"The vagaries of when a six-month review hearing is set are of no moment to the child when it comes to deciding how much longer he or she must wait for a stable, permanent placement. From the child's perspective, prompt, timely resolution within 12 months matters more than whether a full six months may have passed since the six-month review hearing. Delays in holding the six-month review hearing do nothing to diminish the child's interest in receiving a commitment and a loving home, from whoever is able to provide it, at the earliest possible time.

"Conversely, delays in holding the six-month review hearing do nothing to enhance a parent's interest in reunification. There is no rational basis for concluding that a parent whose six-month hearing is delayed to the nine- or 10-month mark should be eligible for an extension to the 15- or 16-month mark of either services or reunification consideration, while another parent whose six-month hearing is timely held must demonstrate a substantial probability of being able to reunite by the 12-month mark." (*Tonya M*. at p. 847.)

Fortunately, in this case, the juvenile court recognized the dilemma and, after inviting argument, considered whether there was a substantial probability the baby would be returned to mother's custody by the 18-month review hearing, which by statute would have to be set on or before August 11, 2022.[6] In order to find a substantial probability of return, the court had to find mother consistently and regularly contacted and visited with the baby, made significant progress in resolving the problems that led to the baby's removal from the home and demonstrated the capacity and ability both to complete the

---

[6] Eighteen months from the baby's initial removal on February 11, 2021, is August 11, 2022.

objectives of her treatment plan and to provide for the baby's safety, protection, physical and emotional well-being, and special needs.  (§ 366.21, subd. (g)(1).)

The juvenile court found there was not a substantial probability the baby would be returned to mother's custody by the 18-month review hearing and the evidence supports its ruling.  Mother had received 12 months of reunification services and although she made earnest efforts to reunify, she had not progressed beyond supervised visitation or demonstrated she could safely resume custody of the baby in the foreseeable future.

## III.    DISPOSITION

The petition for extraordinary writ is denied.  This court's opinion is final forthwith as to this court pursuant to California Rules of Court, rule 8.490(b)(2)(A).